FILED

1   GLANCY BINKOW & GOLDBERG LLP
    LIONEL Z. GLANCY (#134180)
2   MICHAEL GOLDBERG (#188669)
3   ROBERT V. PRONGAY (#270796)
    1925 Century Park East, Suite 2100
4   Los Angeles, California 90067
5   Telephone: (310) 201-9150
    Facsimile:  (310) 201-9160
6   E-mail: info@glancylaw.com

2012 OCT -3  PM 4: 04

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

7

8   *Attorneys for Plaintiff LEE BENG HENG*

9   [Additional Counsel on Signature Page]

10

11              UNITED STATES DISTRICT COURT

12              CENTRAL DISTRICT OF CALIFORNIA

13

14  LEE BENG HENG, Individually and      Case No. SACV12-1707- DOC
15  On Behalf of All Others Similarly                 (ANx)
    Situated,
16
                                         **CLASS ACTION**
17              Plaintiff,
                                         **COMPLAINT FOR**
18              v.                       **VIOLATIONS OF THE**
19                                       **FEDERAL SECURITIES LAWS**
20  QUESTCOR PHARMACEUTICALS,
    INC., DON M. BAILEY, MICHAEL H.
21  MULROY, STEPHEN L. CARTT, and
22  DAVID YOUNG,                         **DEMAND FOR JURY TRIAL**
23              Defendants.
24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Lee Beng Heng ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Questcor Pharmaceuticals, Inc. ("Questcor" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Questcor securities between April 4, 2011 and September 21, 2012, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and

Rule 10b-5 promulgated thereunder against the Company and certain of its top officials.

2.     Questcor is a biopharmaceutical company whose primary product, Acthar, helps patients with serious, difficult-to-treat medical conditions.   Its primary product is H.P. Acthar® Gel (repository corticotropin injection), an injectable drug approved by the FDA for the treatment of 19 indications, in particular the treatment of acute exacerbations of multiple sclerosis ("MS") in adults, as well as the treatment of nephrotic syndrome ("NS"), and of infantile spasms ("IS") in children under two years of age.   The Company generates substantially all its revenues from these three indications, especially MS.

3.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company was disseminating false and misleading statements to the public as to the efficacy of its 60-year-old drug, Acthar, as a treatment for multiple sclerosis and for nephrotic syndrome; (ii) the Company was marketing and promoting Acthar aggressively as a treatment for these conditions, with a woefully inadequate compliance program; and (iii) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

4.      On September 19, 2012, Aetna Inc. announced that it would limit coverage of Acthar, citing studies that suggest the drug is not medically necessary for indications such as multiple sclerosis that are treated with steroids.

5.      On this news, Questcor shares declined $24.17 per share or nearly 48%, to close at $26.35 per share on September 19, 2012.

6.      On September 24, 2012, Questcor announced a U.S. governmental investigation into the Company's promotional practices.

7.      On this news, Questcor shares declined $11.05 per share or 36%, to close at $19.08 per share on September 24, 2012.

8.      As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

11.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as Questcor's principal place of

1    business is located within this District.

2         12.    In connection with the acts, conduct and other wrongs alleged in
3
4    this Complaint, defendants, directly or indirectly, used the means and
5    instrumentalities of interstate commerce, including but not limited to, the United
6
7    States mail, interstate telephone communications and the facilities of the national
8    securities exchange.

9                                    **PARTIES**
10
11        13.    Plaintiff as set forth in the attached Certification, acquired Questcor
12   securities at artificially inflated prices during the Class Period and has been
13
14   damaged thereby.

15        14.    Defendant Questcor is a California corporation with principal
16   executive offices located at 1300 North Kellogg Drive, Suite D, Anaheim,
17
18   California 92807.   Questcor's common stock trades on the NASDAQ Stock
19   Market ("NASDAQ") under the ticker symbol "QCOR."

20        15.    Defendant Don M. Bailey ("Bailey") was, at all relevant times, the
21
22   Company's President and Chief Executive Officer.   During the Class Period,
23   Defendant Bailey sold 440,000 shares of Questcor common stock for proceeds of
24
25   over $17.7 million.

26        16.    Defendant Michael H. Mulroy ("Mulroy") was, at all relevant times,
27
28   the Company's Chief Financial Officer, Secretary and General Counsel.

17.     Defendant Stephen L. Cartt ("Cartt") was, at all relevant times, the Company's Chief Operating Officer.  During the Class Period, Defendant Cartt sold 505,509 shares of his Questcor common stock for proceeds of over $16.2 million.

18.     Defendant David Young ("Young") was, at all relevant times, the Company's Chief Scientific Officer.  During the Class Period, Defendant Young sold 175,124 shares of Questcor common stock for proceeds of over $7.1 million.

19.     The defendants referenced above in ¶¶ 15 through 18 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

20.     Questcor is a company with a single product, a highly specialized, low volume, expensive drug originally approved by the FDA in 1952.  It has since been approved for use in 19 indications, but primarily for infantile spasms, a rare seizure disorder affecting about 1,500 infants a year in the U.S.  In 1978, Acthar was approved for treatment of MS relapse and was used extensively in the 1970s for that purpose, until corticosteroids came on the market and proved to be a superior alternative.

## Materially False and Misleading
## Statements Issued During the Class Period

21.  On April 4, 2011, Questcor issued a press release announcing its preliminary first quarter 2011 results.  The press release stated the following in relevant part:

> New, paid prescriptions of H.P. Acthar® Gel (Acthar) for the treatment of exacerbations of multiple sclerosis (MS) during the quarter were greater than 500, up over 115% from the year ago period and up over 40% from the prior quarter.

> New, paid prescriptions for infantile spasms (IS) were estimated at 88.

> New, paid prescriptions for nephrotic syndrome (NS) were estimated at 18.

> 2,010 vials of the Company's principal drug, Acthar, were shipped during the quarter ended March 31, 2011.

> Gross sales were $48.6 million.

> * * *

> "The strong performance we saw late in the fourth quarter of 2010 has continued in the first quarter of 2011 and was driven by the increasing productivity of our recently expanded Acthar sales force. March showed significant growth in MS prescriptions and exceeded February's record performance by over 50%. In addition, we are pleased with the very early results from the efforts of our small dedicated Nephrology sales team.  While we are very encouraged by the first quarter new prescription results, we note that prior sharp increases in sequential quarterly Acthar  prescriptions have usually been followed by more modest sequential  growth," said Don M. Bailey, President and CEO of Questcor Pharmaceuticals.

22. On April 26, 2011, the Company issued a press release announcing financial results for the first quarter ended March 31, 2011. Specifically, the Company reported net income of $11.2 million, or $0.17 diluted earnings per share ("EPS"), and net sales of $36.8 million for the first quarter of 2011 as compared to net income of $8 million, or $0.12 diluted EPS, and net sales of $26.2 million for the same period a year ago. The press release stated the following in relevant part:

> The Company's financial performance was driven by a 120% year-over-year increase in the number of new paid prescriptions of H.P. Acthar® Gel (Acthar) for the treatment of multiple sclerosis (MS) exacerbations. In the first quarter, paid Acthar prescriptions for the treatment of nephrotic syndrome (NS) increased to 18 while prescriptions for the treatment of infantile spasms (IS) were 89, which is within the historic range for IS.

> "Our strategy to expand the sales force is clearly paying off," said Don M. Bailey, President and CEO of Questcor. "Paid MS prescriptions are up sharply from last quarter. March was a particularly strong month and this momentum has continued so far in April. We believe that Acthar is filling an increasingly important role in the treatment of exacerbations associated with MS and, looking forward, we expect to continue to grow sales in this important therapeutic area."

> Mr. Bailey added, "We are also encouraged by the early positive results from our small, dedicated nephrology sales team, which initiated selling efforts at the beginning of March. The number of nephrologists who are using Acthar to treat patients with nephrotic syndrome is increasing. In addition, during the second quarter we will initiate a company-sponsored Phase IV trial to study Acthar in the treatment of NS associated with idiopathic membranous nephropathy. Acthar is indicated 'to induce a diuresis or a remission

of proteinuria in the nephrotic syndrome without uremia of the idiopathic type or that due to lupus erythematosus'."

23.   After issuing its first quarter 2011 financials, Questcor hosted a conference call where Defendants reiterated the financial results reported in the Company's press release and Defendant Mulroy discussed the Company's financial performance in depth.  Defendants Bailey and Cartt further represented the following in relevant part:

> [BAILEY:]  In summary, we are off to a very good start this year as we continued to execute our straightforward strategy to sell more Acthar. Our decision to expand the MS sales force is clearly paying off. Also, our nephrotic syndrome sales force is having some early success.
>
> * * *
>
> We believe this MS sales performance reflects the strong underlying demand for Acthar. This growth in demand is being driven by the increasing productivity of our expanded sales force.
>
> We believe net sales in the MS market are now about 60% of total Acthar net sales.
>
> * * *
>
> [CARTT:]   Our expanded promotional activities directed to neurologists generated significant growth in Acthar prescriptions for MS during the first quarter. During the quarter, we shipped a record 508 paid Acthar prescriptions, for the treatment of MS relapses. This was an increase of 120% over the year ago period and 44% over the previous quarter.
>
> We believe this performance is a strong signal that the sales force expansion has gained traction in the MS market at a faster rate than we expected.

* * *

[O]ur promotional efforts are increasingly focused on two main goals. One, convincing an increasing number of prescribers about the benefits of using Acthar with their patients, and two, helping doctors, nurses, and others in their medical practice become more effective at identifying potential Acthar patients.

* * *

In addition to increased promotion by our sales reps, Acthar sales are benefiting from our sponsored physician speaker programs.

In these programs, existing Acthar prescribers present to small groups of physicians, their experiences using Acthar and the published efficacy and safety data for Acthar in MS relapses. When combined with follow-up sales calls, these programs appear to be a key driver of our sales growth.

Recently, we have been significantly increasing the number of speaker programs being conducted and expect to continue doing so in the future.

24.   On April 27, 2011, Questcor filed a quarterly report for the period ended March 31, 2011 on Form 10-Q with the SEC, which was signed by Defendants Bailey and Mulroy and reiterated the Company's previously announced financial results.   In addition, the Form 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Bailey and Mulroy stating that the information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

25. In connection with its marketing and promotional activities, the Form 10-Q stated the following in relevant part:

> Selling and marketing expenses were $11.3 million for the three months ended March 31, 2011, as compared to $6.7 million for the three months ended March 31, 2010. The increase of $4.6 million in 2011 as compared to 2010 is due primarily to increases in headcount-related costs and costs associated with our expanded sales and marketing effort. During the latter part of 2010, to further build on positive prescription trends, we doubled the size of our sales organization, increasing the sales force to 77 Acthar specialists and an additional five nephrology sales representatives.

26. On July 26, 2011, the Company issued a press release announcing financial results for its second quarter ended June 30, 2011. For the quarter, the Company reported net income of $13.9 million, or $0.21 diluted EPS, and net sales of $46.0 million as compared to net income of $9.3 million, or $0.14 diluted EPS, and net sales of $28.3 million for the same period a year ago. The press release stated the following in relevant part:

> 147% year-over-year increase in the number of paid H.P. Acthar® Gel (Acthar) prescriptions for the treatment of multiple sclerosis (MS) exacerbations led to increased shipments of Acthar vials. Paid Acthar prescriptions for the treatment of nephrotic syndrome (NS) also increased sharply in the quarter. In addition, paid Acthar prescriptions for the treatment of infantile spasms (IS) were at the highest quarterly level since the third quarter of 2008.

> "Clearly, Questcor had a terrific quarter," said Don M. Bailey, President and CEO of Questcor. "Our focus on expanding the use of Acthar in the treatment of MS exacerbations drove our record second quarter financial performance. Importantly, in spite of the rapid expansion in the use of Acthar for MS exacerbations, we believe that

the prescriber base can continue to grow.  Accordingly, growing MS sales remains our number one priority.  Also, following our early success in nephrotic syndrome, we are immediately and substantially expanding our nephrology selling effort."

"To generate data in support of the expanded nephrology selling effort, we recently initiated a company-sponsored Phase IV trial to study Acthar in the treatment of NS associated with idiopathic membranous nephropathy," continued Mr. Bailey. "And, today, we are announcing our fourth on-label target market for Acthar, systemic lupus erythematosus. We believe that this market has many of the same characteristics as our other three vertical markets for Acthar--MS, NS and IS."

27.  After issuing its second quarter 2011 financial results on July 26, 2011, Questcor hosted a conference call where Defendants reiterated the financial results reported in the Company's press release and Defendant Mulroy discussed the Company's financial performance in depth.  Defendants Bailey, Cartt and Young represented the following in relevant part:

[CARTT:] During the quarter we shipped a record 751 paid Acthar prescriptions for the treatment of MS relapses.  This was an increase of 147% over the year-ago period, and 48% over the previous quarter.  We believe this performance is a strong signal that the sales force continues to gain traction in the MS market at a faster rate than we expected.  In addition to rapid growth, our trends at MS are all very good and indicate that we are building momentum in this key Acthar market.

* * *

So let's summarize.  We are very pleased with the robust growth during the quarter and expect continued growth during 2011 and into 2012 as a result of the continued sustained sales call activity. Our early prescription trends in nephrology are surprisingly strong and we are quickly expanding our sales capability in MS, which will result in a dramatic increase in the number of nephrologists that we

can call on at the end of the third quarter, just about two months away.

* * *

[BAILEY:]  Our go-forward plan is extremely simple and remains to sell more Acthar.  That is, gross sales in each of our key markets. MS, NS and IS, and then expand our commercial effort into other Acthar on-label markets and try to generate Acthar usage in those markets.  In the second quarter we continued our momentum and had increasing sales levels combined with strong profit margins and substantial free cash flow.  We are continuing to focus on MS sales. The commercial team is highly motivated, highly incentivized and highly productive.

Based on positive nephrotic syndrome script growth, we are now increasing our focus on nephrotic syndrome sales and are expanding our MS selling efforts.  We are applying what we have learned during our four MS sales force increases, so that for nephrotic syndrome we can accelerate the commercial team buildout.

28.  On July 29, 2011, Questcor filed a quarterly report for the period ended June 30, 2011 on Form 10-Q with the SEC, which was signed by Defendants Bailey and Mulroy and reiterated the Company's previously announced financial results.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Bailey and Mulroy stating that the information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

29.  In connection with its marketing and promotional activities, the Form 10-Q stated the following in relevant part:

Selling and marketing expenses were $14.7 million for the three months ended June 30, 2011, as compared to $6.0 million for the three months ended June 30, 2010. The increase of $8.7 million in

2011 as compared to 2010 is due primarily to increases in headcount-related costs and costs associated with our expanded sales and marketing effort. During the latter part of 2010, to further build on positive prescription trends, we increased the size of our Specialty Sales Force, which calls on neurologists who treat patients for MS or IS, from 38 representatives to 77 representatives effective November 2010. Additionally, in March 2011, we assembled a Nephrology Sales Force which promotes Acthar exclusively to nephrologists for use in treating NS. Our initial Nephrology Sales Force was comprised of just five representatives and, based on the results of their efforts we are significantly expanding our NS selling effort. Specifically, we are in the process of hiring approximately 23 additional representatives for our Nephrology Sales Force and we are giving a limited supportive selling role to our 77 representative Specialty Sales Force.

30. On October 25, 2011, Questcor issued a press release announcing financial results for its third quarter ended September 30, 2011. For the quarter, the Company reported net income of $22.9 million, or $0.35 diluted EPS, and net sales of $59.8 million, as compared to net income of $11.5 million, or $0.18 diluted EPS, and net sales of $31.3 million for the same period a year ago. The release stated the following in relevant part:

"Questcor's strategy to sell more Acthar continues to generate increasing net sales and earnings," said Don M. Bailey, President and CEO of Questcor. "Our commercial organization is steadily expanding the number of neurologists, nephrologists, and child neurologists prescribing Acthar. We believe Acthar has the potential to benefit many more MS, NS, IS and possibly lupus patients in the future."

"Our 77 person Specialty Sales Force continues to drive expanded usage of Acthar as second-line therapy for MS exacerbations, a key Acthar market," commented Steve Cartt, Executive Vice President and Chief Business Officer. "Furthermore, during the third quarter

we completed the expansion of our Nephrology Sales Force from 5 to 28 representatives, with all new personnel being fully trained and making initial sales calls by October 1st. Despite the inherent disruption involved with this expansion, paid nephrotic syndrome Acthar prescriptions increased during the quarter. September was a particularly strong month for both MS and NS sales."

31.  After issuing its third quarter 2011 financial results on October 25, 2011, Questcor hosted a conference call where Defendants reiterated the financial results reported in the Company's press release and Defendant Mulroy discussed the Company's financial performance in depth.   Defendants Bailey and Cartt represented the following in relevant part:

[CARTT:]   [W]e shipped 886 paid Acthar prescriptions for the treatment of MS relapses during the third quarter of 2011. This was an increase of 174% over the year ago period. In addition to strong script growth, other positive trends in our MS business indicate that we are building momentum in this key Acthar market.

\* \* \*

Switching gears to the subject of new scientific data, several Acthar-related abstracts will be presented in November at the Annual Meeting of the American Society of Nephrology or ASN held this year in Philadelphia. These abstracts are available on ASN's website www.asn-online.org. The new data provides further insight into the immune modulating and other therapeutic properties of Acthar specifically relating to kidney disease.

We believe the availability of this data provides further evidence for the direct action of Acthar on kidney disease. And importantly, the first three abstracts shown may specifically enhance our near-term selling efforts in nephrology. Our emerging understanding of the apparent immune modulating properties of Acthar is also beginning to encourage us to investigate the potentially broader therapeutic applications of Acthar in other inflammatory and autoimmune diseases, many of which are already on the product label for Acthar.

32. On October 27, 2011, Questcor filed a quarterly report for the period ended September 30, 2011 on Form 10-Q with the SEC, which was signed by Defendants Bailey and Mulroy and reiterated the Company's previously announced financial results. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Bailey and Mulroy stating that the information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

33. In connection with its marketing and promotional activities, the Form 10-Q stated the following in relevant part:

> Selling and marketing expenses were $13.7 million for the three months ended September 30, 2011, as compared to $7.7 million for the three months ended September 30, 2010. The increase of $6.1 million in 2011 as compared to 2010 is due primarily to increases in headcount related costs and costs associated with our expanded sales and marketing effort. During the latter part of 2010, to further build on positive prescription trends, we increased the size of our Specialty Sales Force, which calls on neurologists, from 38 representatives to 77 representatives effective November 2010. Additionally, in March 2011, we assembled a Nephrology Sales Force which promotes Acthar exclusively to nephrologists for use in treating NS. Our initial Nephrology Sales Force was comprised of just five representatives and, based on the results of their efforts we have significantly expanded our NS selling effort. Specifically, we have hired approximately 23 additional representatives for our Nephrology Sales Force and have given a limited supportive selling role to our 77 representative Specialty Sales Force.

34.   On January 11, 2012, *TheStreetSweeper.org* issued an article stating that it would publish the first part of a two-part investigative series about Questcor in the following week.  The article stated the following in relevant part:

> The first article raises serious questions about the aggressive marketing practices that QCOR has used to generate explosive – but potentially unsustainable – growth in prescriptions for its only drug while the second story further examines QCOR's business practices, while taking a hard look at the leaders who have struck it rich as a result of the company's controversial growth strategy.

35.   In response to the *StreetSweeper* article, Questcor's stock price dropped $6.20 per share or nearly 15%, to close at $35.34 per share on January 11, 2012.

36.   On January 11, 2012, Questcor issued a press release entitled "Questcor Pharmaceuticals Issues Statement," which stated in relevant part:

> Questcor Pharmaceuticals, Inc. (NASDAQ: QCOR) today announced it became aware that an investor blog is preparing to issue a report regarding the Company's marketing and business practices. Questcor issued the following statement:
>
> The Company believes that its marketing and business practices are consistent with regulatory requirements and industry standard practices. Questcor markets H.P. Acthar® Gel for the treatment of acute exacerbations of multiple sclerosis (MS) in adults, the treatment of nephrotic syndrome, and the treatment of infantile spasms in children under two years of age. The Company maintains a compliance program, which is led by an experienced compliance officer and includes the active participation of Questcor's executive management team. Questcor attributes its success to the ability of Acthar to potentially address the unmet medical need associated with MS exacerbations and nephrotic syndrome. The Company is

committed to providing access to Acthar to patients who need it, and marketing Acthar in accordance with regulatory requirements and industry standard practices. Questcor plans to speak with the publication to discuss the Company and its marketing and business practices.

37. On February 22, 2012, Questcor issued a press release announcing financial results for its fourth quarter and year ended December 31, 2011. For the quarter, the Company reported net income of $31.6 million, or $0.48 diluted EPS, and net sales of $75.5 million as compared to net income of $6.4 million, or $0.10 diluted EPS, and net sales of $29.3 million for the same period a year ago. For the year, the Company reported net income of $79.6 million, or $1.21 diluted EPS, and net sales of $218.2 million as compared to net income of $35 million, or $0.54 diluted EPS and net sales of $115.1 million for the same period a year ago. The release stated in relevant part:

> "Net sales growth in the fourth quarter was driven by the increasing numbers of physicians who are recognizing the potential for Acthar to help patients with MS and NS," said Don M. Bailey, President and CEO of Questcor. "We are particularly encouraged by the growing number of physicians who recognize the therapeutic value of Acthar in their practices, especially for those patients who have not adequately responded to other treatments."

38. Also on February 22, 2012, the Company filed an annual report for the period ended December 31, 2011 on Form 10-K with the SEC, which was signed by, among others, Defendants Bailey and Mulroy, and reiterated the Company's previously announced annual financial results and financial position.

In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants Bailey and Mulroy, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

39.   In connection with its marketing and promotion activities, the 10-K stated the following in relevant part:

> Selling and marketing expenses were $56.7 million for the year ended December 31, 2011, as compared to $31.5 million in 2010 and $19.3 million in 2009. The increase of $25.2 million in 2011 as compared to 2010 is due primarily to increases in headcount related costs, including increased incentive payments to our commercial team and increased bonus compensation for other Company employees, and costs associated with our expanded sales and marketing effort. During the latter part of 2010, to further build on positive prescription trends, we increased the size of our Specialty Sales Force, which calls on neurologists, from 38 representatives to 77 representatives effective November 2010. Additionally, in March 2011, we assembled a Nephrology Sales Force that promotes Acthar exclusively to nephrologists for use in treating NS. Our initial Nephrology Sales Force was comprised of five representatives and, based on the results of their efforts, we significantly expanded our NS selling effort. Specifically, we hired approximately 23 additional representatives for our Nephrology Sales Force and have given a limited supportive selling role to the 77 representatives in our Specialty Sales Force. While we have announced our intention to expand our MS and NS sales forces in 2012, our prescription growth trend may not continue and/or our sales force expansions intended for 2012 may not be successful. The process of significantly expanding a sales force in the biopharmaceutical industry is complex. We modify and re-allocate individual sales territories across our enlarged sales force, which can cause temporary disruptions in our selling efforts. Additionally, while the cost of our new sales representatives impacts our operating expenses immediately, there can be a delay in the expected ability of our new

1  representatives to increase our net sales due to the time it takes for
2  us to train the new representatives and for the new representatives to
3  establish professional relationships with prescribing physicians
   within their territories.

4
5      40.  After issuing its fourth quarter and full year 2011 financial results,

6  Questcor hosted a conference call where Defendants reiterated the financial

7  results reported in the Company's press release and Defendant Mulroy discussed
8
9  the Company's financial performance in depth.  Defendants Bailey, Cartt and

10  Young represented the following in relevant part:

11
12     [BAILEY:]  As we look ahead to 2012 and beyond, we believe we
13     can sustain and re-grow our business due to three key factors. First,
       Acthar provides benefits to many difficult-to-treat patients, not
14     responding to other treatments. Second, our market penetration in
15     terms of the total number of neurologists and nephrologists
16     prescribing Acthar while growing remains relatively small and third,
       we have [assembled an excellent,] experienced commercial team to
17     pursue our growth plan.

18     Our focus remains on helping patients with serious difficult-to-treat
       medical conditions.
19
                                    * * *
20     [CARTT:]  A key priority of ours continues to be educating both
21     physicians and patients about how Acthar is a viable treatment option
       for MS exacerbation or relapses, particularly in those patients not
22     well served by steroid, which are generally considered first line
23     therapy by most neurologists. This focus drove our year-over-year
       increase in the number of paid Acthar prescriptions for MS.
24
25     In the fourth quarter of 2011, there were 945 paid and shipped
       Acthar MS prescriptions, up from 354 scripts in the fourth quarter
26     of 2010. This is a 167% year-over-year increase. There were several
27     factors behind this growth; positive patient outcome, increasing
       awareness among neurologists about how best to incorporate Acthar
28     into their practices, continued excellent Acthar insurance coverage

for MS relapses and the increase in productivity of our MS commercial team, all combined to generate this growth.

* * *

We believe that because Acthar provides real and substantial benefits to many patients who would otherwise continue to suffer the effects of serious, difficult-to-treat disorders, our growth should be sustainable. We are expanding the Organization and associated infrastructure to address the significant growth opportunities in front of us. At the same time, we are off to a good start to 2012, with January MS, NS, and IS paid prescription each having a good month.

41. On April 24, 2012, Questcor issued a press release announcing financial results for its first quarter ended March 31, 2012. The Company reported net income of $38.5 million, or $0.58 diluted EPS, and net sales of $96.0 million, as compared to net income of $11.2 million, or $0.17 diluted EPS, and net sales of $36.8 million for the same period a year ago. The release stated the following in relevant part:

> "While our substantial NS commercial effort only began in the fourth quarter of 2011, the value of NS shipped prescriptions now exceeds that of MS," said Don M. Bailey, President and CEO of Questcor. "This faster-than-expected NS growth drove us to further expand the NS commercial effort prior to the additional expansion of our MS commercial team."

42. After issuing its first quarter 2012 financial results on April 24, 2012, Questcor hosted a conference call where Defendants reiterated the financial results reported in the Company's press release and Defendant Mulroy discussed the Company's financial performance in depth. Defendants Bailey, Cartt and Young represented the following in relevant part:

[BAILEY:]  Questcor's unconventional, but simple business model continues to produce excellent financial results. Shift files, net sales and earnings will all up well over 100% year-over-year. We continued to expand nephrologist and neurologist awareness, our patient benefits from Acthar and as a result, pay prescriptions continue to increase.

Driving our growth in the first quarter was the strong increase in paid prescriptions written by nephrologist to treat patients with nephrotic syndrome, a serious kidney ailment. After a successful pilot program, we stepped up our nephrology commercial effort last October. The expected revenues from nephrotic syndrome prescriptions are accelerating to the point that by our calculation, nephrotic syndrome scrip value now exceeds MS.

* * *

[CARTT:]  Insurance reimbursements for Acthar and nephrotic syndrome continues to be very good with more than 85% of private insurance prescriptions covered. We attribute this continued strong coverage to the severity of the health outcome, if nephrotic syndrome is not adequately treated, coupled with the fact that Acthar is indicated and approved in this condition, and there are few other treatment options.

Further supporting both coverage and prescribing activity is the ongoing flow of positive results coming from the various studies we are funding. In fact data from one study at the University of Toronto is being presented just this week at the Canadian Nephrology Society Annual Meeting. This particular study found that about two thirds of patients with nephrotic syndrome due to idiopathic membranous nephropathy had their proteinuria drop by 50% or more due to Acthar treatment.

* * *

[YOUNG:]   As noted by the newest research analyst to cover Questcor, Acthar can truly be considered a pipeline within a drug. While quite rare, there are, in effect, a few other successful examples of the type of product.  Soliris and Botox come to mind, for example. We have a significant opportunity with Acthar to expand use from our three existing markets that Steve just discussed to other markets that are part of the list of 19 approved on-label indications.

In addition, as we've been learning more about the pharmacology of Acthar, including how and why Acthar acts differently than steroids, there are many other new indications with unmet medical needs where we and others believe Acthar could provide a significant clinical benefit.

Currently, we have approximately 20 company-sponsored pre-clinical and clinical studies ongoing, and are supporting around 20 ongoing investigator-initiated studies.

43.   On April 26, 2012, Questcor filed a quarterly report for the period ended March 31, 2012 on Form 10-Q with the SEC, which was signed by Defendants Bailey and Mulroy and reiterated the Company's previously announced financial results.   In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Bailey and Mulroy stating that the information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

44.   In connection with its marketing and promotion activities, the Form 10-Q stated the following in relevant part:

Selling and marketing expenses were $21.7 million for the three months ended March 31, 2012, as compared to $11.3 million for the three months ended March 31, 2011. The increase of $10.5 million in 2012 as compared to 2011 is due primarily to increases in headcount related costs, including increased incentive payments to our commercial team, and costs associated with our expanded sales and marketing effort. In March 2011, we assembled a Nephrology Sales Force that promotes Acthar exclusively to nephrologists for use in treating NS. Our initial Nephrology Sales Force was comprised of just five representatives, later increased during the third quarter of 2011 to 28 representatives based on the results of their efforts and is currently being expanded to 58 representatives.

45. On July 10, 2012, Citron Research issued an in-depth research report on Questcor. Citron expanded on the *StreetSweeper.org* articles and further raised concerns about the Company's marketing strategy and a possible generic threat to Acthar. The report discussed the competitive landscape for Acthar and was critical of the Company's assertions that there were significant barriers to entry into the market: "[It] is evident that Questcor's Acthar label simply copies the language of the previously approved generic product label for ACTH – no sign of the 'secret sauce' the company's misleading language suggests." Citron further questioned whether there was credible scientific data to support Questcor's aggressive strategy to expand the use of Acthar for indications other than infantile spasms. In addition, the research report analyzed the Company's marketing expenses and questioned how the drug was being marketed to doctors: "The sales and marketing for HP Acthar Gel is now up to $6,100 a vial . . . **more than 5 X the original price of the drug before Questcor became involved.**" [Emphasis in original.] The Citron report criticized Questcor for the lack of any meaningful research and development by the Company: "Just the insider selling over the last year represents more cash than Questcor has spent on research and development over its entire lifespan," the report stated. The Citron report was not only critical of the amount of insider selling over the past year but was also critical of its timing: "[W]henever we see

**large insider selling at the same time the company is buying back large amounts of stock,** it is an ominous sign." [Emphasis in original.]

46. On July 10, 2012, Questcor's common stock dropped $12.57 per share or nearly 22%, to close at $45.07 per share on July 10, 2012.

47. On July 24, 2012, Questcor issued a press release announcing financial results for its second quarter ended June 30, 2012. The Company reported net income of $41.5 million, or $0.65 diluted EPS, and net sales of $112.5 million, as compared to net income of $13.9 million, or $0.21 diluted EPS, and net sales of $45.9 million for the same period a year ago. The release stated in relevant part:

> "In the second quarter, we surpassed $100 million in quarterly net sales for the first time in our history," said Don M. Bailey, President and CEO of Questcor. "Our strong financial results were driven by increasing usage of Acthar among nephrologists and neurologists. With the expansion of our Nephrology Sales Force now complete, the expansion of our Neurology Sales Force nearing completion, and the initial detailing effort of a small sales force in Rheumatology just getting started, we are optimistic about the potential for Acthar to help an increasing number of patients with serious, difficult-to-treat autoimmune and inflammatory disorders."

48. After issuing its second quarter 2012 financial results on July 24, 2012, Questcor hosted a conference call where Defendants reiterated the record financial results reported in the Company's press release and Defendant Mulroy discussed the Company's financial performance in depth. Defendants Bailey,

Cartt and Young represented the following in relevant part:

> [BAILEY:] We made significant progress with our business in the last three months. Financial performance again improved. We almost doubled the number of shipped vials in the quarter more than doubled net sales and tripled earnings from the year ago quarter. Paid scripts increased for both nephrotic syndrome and MS. We expanded two sales forces and starting building a third sales force in rheumatology using the same formula that works out well with MS and nephrotic syndrome. And we also made good progress in both our science and compliance programs.

> \* \* \*

> [CARTT:] Very importantly, we often hear anecdotally that Acthar treatment is producing positive results for patients. This is not always the case, of course, not everyone responds, but clearly, many patients are benefiting significantly from this drug and there are few other treatment options available. All these factors are contributing to the rapid increase in Acthar usage in nephrotic syndrome.

> \* \* \*

> Our year-over-year growth in MS paid scripts is due to positive patient outcomes, increasing awareness about how Acthar can help patients who are not fully benefiting from other therapies, continued excellent Acthar insurance coverage for MS relapse, and the increasing productivity of our MS commercial team.

> \* \* \*

> [YOUNG:] As you can see by our operating results reported in today's press release we've been increasing our investment in research and development to better understand the unique immunomodulator and anti-inflammatory properties of Acthar Gel. Our subjects are objective that produce additional supporting data for the commercial team for on-label indications and to expand our Acthar Gel used through FDA beyond the current on-label indications.

Surprisingly, previous owners of Acthar Gel in the pharmaceutical industry in general have not invested in ACTH-based research. Therefore, there are many research areas that still need to be assessed by our R&D group in order to better understand ACTH and the clinical roles of Acthar Gel.

* * *

In summary, I'd like to bring you back to my initial topic on our R&D efforts. We have previously reported our R&D efforts have been and are continuing to focus on three areas. First, producing its additional supporting data for the commercial team for on-label indications. Second, extending Acthar use -- Acthar Gel use beyond existing on-label indications in the following FDA processes. And third, our greatest priority, better understanding the unique chemical, biological and clinical characteristics of Acthar Gel.

Our research results from this third area thus far suggest that development of generic drugs of Acthar Gel is very challenging. All three areas of research are intended to advance the science of Acthar Gel in order to improve to help patients with devastating autoimmune and inflammatory diseases.

49. On July 25, 2012, Questcor filed a quarterly report for the period ended June 30, 2012 on Form 10-Q with the SEC, which was signed by Defendants Bailey and Mulroy and reiterated the Company's previously announced financial results. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Bailey and Mulroy stating that the information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

50. In connection with its marketing and promotion activities, the Form 10-Q stated the following in relevant part:

Selling and marketing expenses were $27.6 million for the three months ended June 30, 2012, as compared to $14.7 million for the three months ended June 30, 2011 . The increase of $12.9 million in 2012 as compared to 2011 is due primarily to increases in headcount-related costs and costs associated with our expanded sales and marketing effort. In March 2011, we assembled a Nephrology Sales Force that details Acthar exclusively to nephrologists for use in treating NS. Our initial Nephrology Sales Force was comprised of just five representatives and commenced activities in the second quarter of 2011. This sales force was increased during the third quarter of 2011 to 28 representatives based on the results of their efforts and as of May 29, 2012 was expanded further to 58 representatives.

51.  The statements referenced in ¶¶ 21-33; 36-44; and 47-50 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, including that: (i) the Company was disseminating false and misleading statements to the public as to the efficacy of its 60-year-old drug, Acthar, as a treatment for multiple sclerosis and for nephrotic syndrome; (ii) the Company was marketing Acthar aggressively as a treatment for these conditions, with an inadequate compliance program to monitor such marketing; and (iii) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

**The Truth Emerges**

52.  On September 19, 2012, Citron reported that insurance giant Aetna had recently revised its policy to severely limit coverage of Questcor's primary

drug, Acthar.   Aetna's findings concluded that clinical research supported only

one of the 19 indications, that it was only "medically necessary" for treatment of

West syndrome, a rare condition that causes infantile spasms, and not for other

indications such as MS which are treated with steroids.   According to Aetna's

Clinical Policy Bulletin:

> I.    Aetna considers repository corticotropin (H.P. Acthar® Gel) medically necessary for West syndrome (infantile spasms)
>
> II.   Aetna considers repository corticotropin not medically necessary for diagnostic testing of adrenocortical function because it has not been shown to be superior to cosyntropin for this purpose.
>
> III.  Aetna considers repository corticotropin not medically necessary for corticosteroid-responsive conditions because it has not been proven to be more effective than corticosteroids for these indications.
>
> IV.   Aetna considers repository corticotropin experimental and investigational for all other indications because its effectiveness for these indications has not been established.
>
> ***
>
> ACTH Gel [such as Acthar] is rarely necessary for . . . corticosteroid-responsive conditions [including MS and nephrotic syndrome]. . . .   In addition, there are a lack of clinical studies comparing the effectiveness of ACTH gel to corticosteroids in corticosteroid-responsive conditions.  Also, because of uncertainties in the effect of ACTH gel on the magnitude of endogenous cortisol production, ACTH gel has the potential for inducing significant adverse effects.

53.  Later in the day, Questcor issued a press release entitled "Questcor

Comments on Insurance Policy Bulletin," stated the following in relevant part:

The Company is continuing to review the Clinical Policy Bulletin related to Acthar from Aetna Inc. ("Aetna"). Currently, the Company does not believe that the bulletin represents a material change in insurance coverage for Acthar by Aetna. During 2012, Aetna has accounted for approximately 5% of the Company's shipped prescriptions for Acthar. Based on its current assessment of the Clinical Policy Bulletin, the Company does not believe that the bulletin will have a material impact on the Company's results of operations.

54.   On this news, Questcor's stock dropped $24.17 per share or nearly 48%, to close at $26.35 per share on September 19, 2012.

55.   On September 24, 2012, Questcor announced in a Form 8-K that the U.S. government had initiated an investigation into the Company's promotional practices.

56.   On this news, Questcor's stock dropped $11.05 per share, or almost 37%, to close at $19.08 per share on September 24, 2012.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

57.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Questcor securities during the Class Period (the "Class"); and were damaged thereby.   Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs,

successors or assigns and any entity in which defendants have or had a controlling interest.

58. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Questcor securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Questcor or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

59. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

60. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

61.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Questcor;

- whether the Individual Defendants caused Questcor to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Questcor securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

62.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

63. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Questcor securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Questcor securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

64. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

65. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

66. This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

67. During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Questcor securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Questcor securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

68. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the

preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Questcor securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Questcor's finances and business prospects.

69. By virtue of their positions at Questcor, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

70. Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in

order to personally benefit from the sale of Questcor securities from their personal portfolios.

71. Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of Questcor, the Individual Defendants had knowledge of the details of Questcor's internal affairs.

72. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Questcor. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Questcor's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Questcor securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Questcor's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Questcor securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon

statements disseminated by defendants, and were damaged thereby.

73.    During the Class Period, Questcor securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Questcor securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Questcor securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Questcor securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

74.    By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

75.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection

1    with their respective purchases, acquisitions and sales of the Company's
2    securities during the Class Period, upon the disclosure that the Company had
3
4    been disseminating misrepresented financial statements to the investing public.

5                                 **COUNT II**
6                    **(Violations of Section 20(a) of the**
7              **Exchange Act Against The Individual Defendants)**

8          76.  Plaintiff repeats and realleges each and every allegation contained in
9
10   the foregoing paragraphs as if fully set forth herein.

11         77.  During the Class Period, the Individual Defendants participated in
12
13   the operation and management of Questcor, and conducted and participated,
14   directly and indirectly, in the conduct of Questcor's business affairs.  Because of
15
16   their senior positions, they knew the adverse non-public information about
17   Questcor's misstatement of income and expenses and false financial statements.

18         78.  As officers and/or directors of a publicly owned company, the
19
20   Individual Defendants had a duty to disseminate accurate and truthful
21   information with respect to Questcor's financial condition and results of
22
23   operations, and to correct promptly any public statements issued by Questcor
24   which had become materially false or misleading.

25         79.  Because of their positions of control and authority as senior officers,
26
27   the Individual Defendants were able to, and did, control the contents of the
28   various reports, press releases and public filings which Questcor disseminated in

the marketplace during the Class Period concerning Questcor's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Questcor to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Questcor within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Questcor securities.

80.  Each of the Individual Defendants, therefore, acted as a controlling person of Questcor.  By reason of their senior management positions and/or being directors of Questcor, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Questcor to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Questcor and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

81.  By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Questcor.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury

Dated:  October 3, 2012                         GLANCY BINKOW & GOLDBERG LLP

By:  _____
Lionel Z. Glancy
Michael Goldberg
Robert V. Prongay
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150
Facsimile:   (310) 201-9160
Email:  info@glancylaw.com

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 39 -

1

2          **POMERANTZ GROSSMAN**
           **HUFFORD DAHLSTROM**
3               **& GROSS LLP**

4          Marc I. Gross

           Jeremy A. Lieberman
5          600 Third Avenue - 20th Floor

6          New York, New York 10016
           Telephone:  (212) 661-1100
7          Facsimile:  (212) 661-8665

8          **POMERANTZ GROSSMAN**
           **HUFFORD DAHLSTROM**
9               **& GROSS LLP**

10         Patrick V. Dahlstrom

11         Ten South LaSalle Street - Suite 3505
           Chicago, Illinois 60603
12         Telephone:  (312) 377-1181

13         Facsimile:  (312) 377-1184

14         *Counsel for Plaintiff*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Certification of Plaintiff
## Pursuant to Federal Securities Laws

1.   I, _LEE BENG HENG_          , make this declaration pursuant to Section 101 of the Private Securities Litigation Reform Act of 1995 as required by Section 21D (a) (2) of Title I of the Securities Exchange Act of 1934.

2.   I have reviewed a Complaint against Questcor Pharmaceuticals, Inc. ("Questcor"), and authorize a filing of a comparable complaint on my behalf.

3.   I did not purchase my Questcor securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under Title I of the Securities Exchange Act of 1934.

4.   I am willing to serve as a representative party on behalf of a class as set forth in the Complaint, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.   To the best of my current knowledge, the attached sheet lists all of my purchases and sales in Questcor securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws, except as follows:

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

8.   The matters stated in this declaration are true to the best of my current knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed _02 October 2012_, at _Republic of Singapore_

(Date)

(City, State)

(Signature)

LEE BENG HENG

(Type or Print Name)

## SUMMARY OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES | PRICE PER SHARE |
|---|---|---|---|
| 9/21/12 | Purchase | 230 | $31.70 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Name & Address:
Lionel Z. Glancy (#134180)
Glancy Binkow & Goldberg LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Lee Beng Heng, Individually and On Behalf of All Others Similarly Situated,<br><br><br>PLAINTIFF(S)<br>v.<br><br>QUESTCOR PHARMACEUTICALS, INC., DON M. BAILEY, MICHAEL H. MULROY, STEPHEN L. CARTT, and DAVID YOUNG,<br><br>DEFENDANT(S). | CASE NUMBER<br><br>SACV12-1707- DOC (ANx)<br><br><br>**SUMMONS** |

TO:    DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, __Lionel Z. Glancy_____, whose address is __1925 Century Park East, Suite 2100, Los Angeles, CA 90067_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: ___**OCT - 3 2012**_____

By: _____**MARILYN DAVIS**_____
                              Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

Name & Address:
Lionel Z. Glancy (#134180)
Glancy Binkow & Goldberg LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| Lee Beng Heng, Individually and On Behalf of All Others Similarly Situated, | CASE NUMBER |
|---|---|
| PLAINTIFF(S) | SACV12-1707-DOC (ANx) |
| v. | |
| QUESTCOR PHARMACEUTICALS, INC., DON M. BAILEY, MICHAEL H. MULROY, STEPHEN L. CARTT, and DAVID YOUNG, | SUMMONS |
| DEFENDANT(S). | |

TO:    DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, _Lionel Z. Glancy_____, whose address is _1925 Century Park East, Suite 2100, Los Angeles, CA 90067_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Dated: ___**OCT - 3 2012**_____

Clerk, U.S. District Court

By: _____
                        Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge David O. Carter and the assigned discovery Magistrate Judge is Arthur Nakazato.

The case number on all documents filed with the Court should read as follows:

## SACV12- 1707 DOC  (ANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

======================================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [ ] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)

Lee Beng Heng, Individually And On Behalf of All Others Similarly Situated,

**DEFENDANTS**

QUESTCOR PHARMACEUTICALS, INC., DON M. BAILEY, MICHAEL H. MULROY, STEPHEN L. CARTT, and DAVID YOUNG,

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Lionel Z. Glancy (#134180), Glancy Binkow & Goldberg LLP
1925 Century Park East, Suite 2100, Los Angeles, CA 90067
Telephone: (310) 201-9150

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff

☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant.)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes ☐ No      ☐ **MONEY DEMANDED IN COMPLAINT: $** to be proved

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Violation of Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending |  | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations |  | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | ☐ 820 Copyrights |
| ☐ 810 Selective Service |  | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 830 Patent |
| ☑ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability |  | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | **REAL PROPERTY** |  | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | **IMMIGRATION** |  | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 462 Naturalization Application |  | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 245 Tort Product Liability | ☐ 463 Habeas Corpus-Alien Detainee |  | ☐ 871 IRS-Third Party 26 USC 7609 |
|  | ☐ 245 Tort Product Liability | ☐ 290 All Other Real Property | ☐ 465 Other Immigration Actions |  |  |
|  | ☐ 290 All Other Real Property |  |  |  |  |

**FOR OFFICE USE ONLY:** Case Number: SACV12-1707

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑No   ☐ Yes
If yes, list case number(s): _____

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑No   ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)   ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
   ☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
   ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
   ☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:**  (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Plaintiff Lee Beng Heng - Singapore |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| QUESTCOR PHARMACEUTICALS, INC., DON M. BAILEY, MICHAEL H. MULROY, STEPHEN L. CARTT, and DAVID YOUNG - Anaheim, CA | |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
   **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X.  SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date  October 3, 2012

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program.  (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability.  (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |